UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ONEIL QUINONES et al.,

Defendants.

**REPORT AND
RECOMMENDATION**

**AND**

**DECISION AND ORDER**

13-CR-83S

## I. INTRODUCTION

The Hon. William M. Skretny referred this case to this Court under 28
U.S.C. § 636(b).  (Dkt. No. 15.)  Pending before the Court are various pretrial
motions filed by each of the defendants, including certain motions to suppress
evidence.  The Court has held oral argument and hearings for the motions;
transcripts for the hearing proceedings are available at Docket Nos. 150, 208,
209, 244, 245, 248, and 301.

The Court now issues its rulings for the non-dispositive motions submitted
and its recommendations for the dispositive motions.  The following table of
contents should help the reader navigate the motions that each defendant filed:

I.   INTRODUCTION ..................................................................................................... 1

II.  BACKGROUND ...................................................................................................... 3

III.  DISCUSSION ......................................................................................................... 3

  A.  Oneil Quinones...................................................................................................... 3

    i.   Compel Video Annotations—Non-dispositive...................................................... 3

    ii.  Suppression of Photo Arrays—Dispositive........................................................... 7

    iii. Primary Custody Designation—Non-dispositive............................................... 12

B.   Jorge Quinones .................................................................................. 12

   i.   Omnibus Pretrial Motions—Non-dispositive ..................................... 12

   ii.   Suppression of Statements—Dispositive ......................................... 17

C.   Oscar Romero ................................................................................... 18

   i.   Omnibus Pretrial Motions—Non-dispositive ..................................... 18

   ii.   Bruton Motion—Dispositive ............................................................ 19

   iii.   Suppression of Wiretap Evidence—Dispositive ............................... 19

D.   Ellis Colon ........................................................................................ 20

   i.   Omnibus Pretrial Motions—Non-dispositive ..................................... 20

   ii.   Suppression of Search at 219 Fenton Street—Dispositive ............... 20

E.   Edwin Sanchez .................................................................................. 25

F.   Jose Rivera ....................................................................................... 25

   i.   Omnibus Pretrial Motions—Non-dispositive ..................................... 25

   ii.   Suppression of Wiretap Evidence—Dispositive ............................... 25

   iii.   Suppression of Traffic Stop Evidence—Dispositive ......................... 30

   iv.   Suppression of Search of 1517 Ashland—Dispositive ..................... 32

G.   Angel Sanchez .................................................................................. 36

H.   Raul Ramirez Vargas ......................................................................... 36

I.   Josbel Garcia .................................................................................... 36

J.   Miguel Manso .................................................................................... 36

IV.   CONCLUSION ...................................................................................... 37

V.   OBJECTIONS......................................................................................... 37

## II. BACKGROUND

This case concerns allegations that defendants ran a street gang in the City of Buffalo called the Loiza Boys and that the gang's activities included extensive narcotics distribution.  Pre-indictment complaints (Dkt. Nos. 1(1), 1(2), 1(3)) detail how some of the defendants possessed firearms in furtherance of the gang's activities and sold narcotics to confidential informants.  The Government filed an indictment on April 5, 2013.  (Dkt. No. 10.)  The indictment contains 12 substantive counts plus two forfeiture notices.  In the substantive counts, the Government accuses different combinations of defendants with drug conspiracy, maintaining a drug-involved premises, possession with intent to distribute and distribution on different occasions, and possession of firearms in furtherance of drug trafficking.  The Court arraigned most defendants on April 10, 2013; arraigned defendant Miguel Manso on May 2, 2013;[1] and arraigned defendant Oscar Romero on April 4, 2014.

The Court will provide further case background as needed with each motion below.

## III. DISCUSSION

### A. Oneil Quinones

    *i.   Compel Video Annotations—Non-dispositive*

Defendant Oneil Quinones ("Oneil") filed a motion on April 7, 2015 (Dkt. No. 273) for an order directing production of indexes, summaries, logs, notes, or

---

[1] Magistrate Judge H. Kenneth Schroeder, Jr. covered this arraignment.

other reports associated with certain video discovery that the Government

produced.  The discovery in question comprises approximately 3,240 hours of

continuous video footage captured by a pole camera in the vicinity of 10th Street

in the City of Buffalo.  Oneil objects that the video footage does not identify the

people, bicycles, automobiles, license plates, or other traffic in and around the

area recorded.  The video footage, according to Oneil, came with no annotations

identifying which defendants appear at what times.  Given the volume of the

video footage, the lack of identifications or other annotations forces counsel to

choose between leaving the footage unusable and investing potentially

thousands of hours reviewing all the footage, creating original annotations, and

then discussing the footage with his client in the presence of an interpreter.  The

Government responds that, to accompany the video footage, it produced a

compact disc to all counsel containing handwritten notes that agents took while

observing activity through the pole camera.

"[A]s the technology becomes more prevalent, the Government and

defendants will come to produce more and more [electronically stored

information] (as the original source for evidence, such as in crimes involving

computers, or as a means to compile evidence) along with other, traditional

forms of discovery."  *U.S. v. Briggs*, No. 10CR184S, 2011 WL 4017886, at *7

(W.D.N.Y. Sept. 8, 2011) (Scott, *M.J.*).  A collection of thousands of hours of

continuous video footage is an example of discovery not possible as recently as

4

10–15 years ago, because the recording and storage technology either did not exist yet or was prohibitively expensive.  As technology expands the volume and the range of potential discovery in criminal cases, courts have started to recognize that the Government needs to impose at least some minimal organization on voluminous discovery to comply with the spirit of its statutory and constitutional obligations.  *See, e.g., U.S. v. Warshak*, 631 F.3d 266, 296–97 (6th Cir. 2010) (finding no discovery abuses where, *inter alia*, "the government furnished the defendants with a detailed room-by-room inventory of all items seized from the company, including a listing of the various  computers that were imaged") (internal quotation marks omitted); *U.S. v. Huntress*, No. 13-CV-199S, 2015 WL 631976, at *28 (W.D.N.Y. Feb. 13, 2015) (Skretny, *C.J.*) (denying a motion for a bill of particulars where the Government "has produced 137,000 pages of discovery on DVDs that are 'readily loadable into a searchable format' and accompanied by an index of these materials"); *U.S. v. Vujanic*, No. 3:09-CR-249-D (17), 2014 WL 3868448, at *2 (N.D. Tex. Aug. 6, 2014) (finding no *Brady* violation where the Government "has stated that it will identify the sources of seized items; and it has advised Vujanic's counsel that all email and instant message chats involving Vujanic are located within 8 terabytes or 2 terabytes of data rather than within the entire universe of discovery"); *U.S. v. Weaver*, 992 F. Supp. 2d 152, 156 (E.D.N.Y. 2014) (denying a motion to identify *Brady* materials where "the government has provided detailed indices for all the materials it

produced, the majority of which were provided in both PDF and 'load-ready' file format that could be easily searched"); *U.S. v. Chen*, No. C05-375 SI, 2006 WL 3898177, at *3 (N.D. Cal. Nov. 9, 2006) (ordering a bill of particulars where discovery "includes non-documentary evidence reflected in at least 22 CDs containing approximately 111,250 TIFF images, 25 CDs containing approximately 1,250 photographs, 22 CDs containing approximately 5,800 minutes of audio recordings, and 30 CDs containing approximately 900 minutes of video surveillance"). That said, "the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence." *U.S. v. Skilling*, 554 F.3d 529, 576 (5th Cir. 2009) (citations omitted), *vacated in part on other grounds*, 561 U.S. 358 (2010).

For now, the Court will take a measured approach to addressing Oneil's motion. The Government presumably would not play 3,240 hours of video at trial; if it plays any video footage at all then it likely would identify which defendants appear where in the footage as part of its preparation. The Court directs the Government to share with all defendants some kind of annotation that identifies which of them appears on camera at any given time. At least for now, the Court will not wade into the details of how that invitation should look or how much of the video footage needs to be annotated, as long as the defendants on screen at any given time are identified for any footage that the Government is contemplating using at trial. The Government will provide that annotation early

6

enough to allow defendants to make any necessary pretrial motions and to avoid any speedy-trial delay that would be attributable to the Government.  Between that annotation and the handwritten notes that the Government has furnished, Oneil and the other defendants should have a fair opportunity to review the footage and to prepare case strategies for it.  The Court denies this motion to the extent that it seeks any other relief.

ii.    *Suppression of Photo Arrays—Dispositive*

Oneil also has filed a motion (Dkt. No. 307) to suppress information obtained from certain photo arrays.  The Court held a hearing about these photo arrays on July 7, 2015.  (Dkt. Nos. 298, 301.)  Briefly, FBI Special Agent Jason Galle ("Galle") spoke with confidential informants from time to time to determine whether they had any information about any targets of the investigation in this case.  "I would travel with a series of photographs, meet with the source, debrief the source and then typically I will show the entire set of photographs to the source and ask them to tell me any and all information, if any, that they know about the individual photographed."  (Dkt. No. 301 at 53.)  The photographs did not show the names of the people depicted when the informants reviewed them. Galle told the informants nothing about the people depicted in the photographs. If the informants recognized anyone in the photographs then they told Galle what they knew about those people.  Galle memorialized the informants' recollections through the handwritten notes and FD-1023 reports entered into evidence at the

7

hearing as Government Exhibits 1–4 and 6, and Defense Exhibits B and C.  At the hearing, Galle furnished copies of the photographs that he would have used in the photo arrays; the original photographs in the original sequence were no longer available.  "Throughout the pendency of the investigation I maintained a binder that had photographs of each individual.  Unfortunately, as other members of my squad, sometimes that got picked through, or if we met with another individual—some of the photographs are maintained in the original folded—you can see the 3 hole punch up here.  Those individuals, I just printed those, but those are exactly—those are the representations, those are the photographs I used, those are the photographs I had of these individuals at the time."  (*Id.* at 79.)

Oneil seeks suppression of evidence derived from the photo arrays for several reasons.  Oneil objects to the unavailability of the original photographs and his inability to inspect the originals for any signs of suggestiveness.  Oneil argues that the bottoms of the photographs contained identifying information for the people depicted and that he has no way of confirming that Galle in fact concealed that information before showing it to the informants.  Oneil argues further that Galle has not identified which informants identified which defendants and has not identified the basis of any familiarity between any informants and any defendants.  The Government defends the photo arrays by noting that Galle knew in advance from debriefing the informants what each informant might have

known about different targets of the investigation.  The advance information
would have helped Galle check any identifications as reliable.  When the
informants saw the photo arrays, they did not receive any information about
anyone depicted and would have identified people in the arrays from their own
personal knowledge.  The Government concludes that nothing about the photo
arrays suggested any information to the informants.

"The linchpin for admissibility of identification testimony is reliability.  In
reviewing a due process challenge to the admission of such testimony, we must
look at the facts of each case and the totality of the surrounding circumstances.
The ultimate questions are whether the pretrial proceedings have been
conducted in a manner that was unnecessarily suggestive and whether, in all the
circumstances, there is a very substantial likelihood of irreparable
misidentification."  *U.S. v. Maldonado–Rivera*, 922 F.2d 934, 973 (2d Cir.1990)
(internal quotation marks and citations omitted).  When defendants challenge a
photographic array as suggestive, courts review the array and assess "a number
of factors, including the size of the array, the manner of presentation by the
officers, and the array's contents.  If there is nothing inherently prejudicial about
the presentation, such as use of a very small number of photographs or of
suggestive comments, the principal question is whether the picture of the
accused, matching descriptions given by the witness, so stood out from all of the
other photographs as to suggest to an identifying witness that that person was

more likely to be the culprit.  The array must not be so limited that the defendant is the only one to match the witness's description of the perpetrator."  *Id.* at 974 (internal quotation and editorial marks and citations omitted).

This Court reviewed a substantially similar photo array in *U.S. v. Rodriguez*, No. 12-CR-45S, 2013 WL 6057862 (W.D.N.Y. Nov. 13, 2013) (Scott, M.J.), *report and recommendation adopted*, 12-CR-45 at Dkt. No. 153.  In *Rodriguez*, agents maintained a photo book that they would present to various interviewees during the course of the investigation.  If the interviewees recognized anyone in the photographs then they would tell the agents what they knew about whom they recognized.  The Court noted the difference between that photo book and a more typical photo lineup:

> The above references to a "culprit" or a "perpetrator" highlight one aspect of the typical review of suggestiveness that is critical to the review of the pending motion: the "closed-ended" nature of the witness identification.  That is, the typical identification occurs after a witness observes a distinct perpetrator committing a crime or fleeing the scene of a crime.  The existence of a crime committed and a perpetrator with certain characteristics is a closed matter.  Law enforcement officials then investigate the crime, and if their investigation leads them to one or more distinct suspects then they try to have the witness identify a suspect as the perpetrator. Suggestiveness in this typical scenario means that law enforcement officials do something or say something during the preparation and execution of the identification procedure that fills in the witness's memory of the fleeting encounter with or observation of the perpetrator.  The improper result of a suggestive procedure is a match between what the witness says and what law enforcement officials want the witness to say, which is not necessarily a match between the perpetrator and a suspect.

10

In contrast, the interviewees who reviewed the photo book in this case controlled how many perpetrators might come under investigation, what crimes would be discussed with the law enforcement agents, and what the characteristics of the perpetrators would be, thus making the identifications of Rodriguez "open-ended."  During the interviews preceding the photo book presentation, the interviewees controlled the conversation by discussing only their personal knowledge of events that might have been of interest to the agents.  If the interviewees had fabricated any personal knowledge of events then the agents would have chosen not to present a photo book.  When the agents presented the interviewees with the photo book, they asked the interviewees only to identify anyone they recognized and how they recognized them.  There was no distinct perpetrator toward which the agents might have wanted to push the interviewees, and the agents had no way to implant in an interviewee's memory an entire relationship that would give rise to personal knowledge.  The interviewees thus controlled whether and what kind of positive responses they gave the agents after viewing the photo book.

*Rodriguez*, 2013 WL 6057862, at *3 (citations omitted).

The same principles apply here.  Unlike a more traditional photo lineup, Galle had no particular person in the photo arrays whom he wanted singled out as a distinct perpetrator.  Galle perhaps could have been more careful about maintaining the original photographs, but given the amount of detail in the handwritten notes and in the FD-1023 reports, there is no way that Galle could have suggested so much information or such specific information to the informants.  "The interviewees might have guessed that everyone depicted in the photo book was a person of interest in some way, especially after up to 10 hours of pre-presentation interviews.  Even so, however, the interviewees either had

relationships with the people depicted in the photo book or not." *Id.* (citation omitted).

The Court thus does not find any aspect of Galle's photo arrays that were suggestive.  The Court accordingly recommends denying this motion from Oneil.

### iii.   Primary Custody Designation—Non-dispositive

Given prior discussion that appears to been inconclusive (Dkt. No. 286), the Court, if only as a housekeeping matter, denies Oneil's motion about primary custody designation (Dkt. No. 275) but without prejudice.

### B. Jorge Quinones

### i.   Omnibus Pretrial Motions—Non-dispositive

Defendant Jorge Quinones ("Jorge") has filed a variety of non-dispositive pretrial discovery motions.  (*See generally* Dkt. No. 92.)  "Although there is no general constitutional right to pretrial discovery in a federal criminal case, a defendant does have a pretrial discovery right with respect to certain matters. For example, under the Fifth Amendment's Due Process Clause, a defendant is entitled to specific exculpatory evidence which is material either to guilt or punishment.  In addition, the Government has certain disclosure obligations under Rule 16 of the Federal Rules of Criminal Procedure and the Jencks Act, 18 U.S.C. § 3500." *U.S. v. Hong*, 545 F. Supp. 2d 281, 284 (W.D.N.Y. 2008) (Scott, *M.J.*).  With these general principles in mind, the Court will assess each of Jorge's discovery motions.

Pursuant to Rule 12(b), Jorge has requested that the Government give notice of its intention to use at trial certain categories of evidence that would be discoverable under Rule 16, to give them an opportunity to move to suppress under Rule 12 (b)(3)(C).  To the extent that the Government has not already done so, the Government is directed to provide either notice to the defendants as requested or notice of any objections to the requests.

Jorge also has requested production of statements, tangible items, reports, and other information under Rule 16.  The extent that it is not already done so, the Government is directed either to produce or to make available for inspection the items that Jorge has specified, in accordance with Rule 16.

Jorge has moved for a Bill of Particulars.  Rule 7(f) of the Federal Rules of Criminal Procedure allows the Court to direct the filing of a Bill of Particulars. Bills of Particulars are to be used only to protect a defendant from double jeopardy and to enable adequate preparation of a defense and to avoid surprise at trial.  *U.S. v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987) (citations omitted). "The important question is whether the information sought is necessary, not whether it is helpful.  It is improper to use a bill of particulars to compel the Government to disclose the manner in which it will prove the charges or preview its evidence or legal theory."  *U.S. v. LaMorte*, 744 F. Supp. 573, 577 (S.D.N.Y. 1990) (citations omitted).  Upon review of the Indictment and the Government's response to the omnibus motions, the Court finds that each defendant is not

13

entitled to a Bill of Particulars inasmuch as they are sufficiently advised of the charges against each of them to allow for the proper preparation of a defense, to avoid surprise at trial, and to protect the defendants from double jeopardy.  The only potential exception concerns the annotation of video footage explained above for co-defendant Oneil.  The denial of a Bill of Particulars to any defendant is without prejudice to revisiting the request if the Government does not furnish annotation that identifies which defendants appear when in the video footage.

Jorge also seeks information under FRE 404, 608, and 609.  FRE 404(b) governs requests for disclosure of all evidence of prior bad acts that the Government intends to use in its case-in-chief.  FRE 404 requires that defendants be given "reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to use at trial."  To the extent that the Government intends to use any such evidence of a prior bad act in its case in chief, the Government shall produce all FRE 404(b) evidence as directed by the District Court in the trial order.

With respect to defendants' requests under FRE 608 and 609, the only notice requirement imposed by either Rule applies where a party intends to introduce evidence of a conviction that is more than ten years old.  Under such circumstances, FRE 609(b) mandates that "the proponent [give] to the adverse party sufficient advance written notice of intent to use such evidence to provide

14

the adverse party with a fair opportunity to contest the use of such evidence."  To the extent the Government intends to use a conviction more than 10 years old, it must comply with this requirement.  The Government has no obligation to provide any defendant with notice of any material that will be used to impeach him pursuant to FRE 608 should he elect to testify.  *See U.S.  v. Livoti*, 8 F. Supp. 2d 246 (S.D.N.Y. 1998); *U.S. v. Song*, No. 95 Cr. 129 (KMW), 1995 WL 736872, at *7 (S.D.N.Y. Dec. 13, 1995).

Jorge seeks the disclosure of all potentially exculpatory materials, including information to be used for the impeachment of the Government's witnesses, as required under *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny.  *Brady* material, as those cases have come to define it, includes all evidence which may be favorable to the defendant and material to the issue of guilt or punishment.  Such evidence includes "[a]ny and all records and/or information which might be helpful or useful to the defense in impeaching ... [and] [a]ny and all records and information revealing prior misconduct ... attributed to the [Government's] witness."  *U.S. v. Kiszewski*, 877 F.2d 210 (2d Cir. 1989). Jorge also seeks disclosure of the statements of witnesses under the Jencks Act (15 U.S.C. § 3500).

The Government has acknowledged its obligations under *Brady* and *Giglio v. U.S.*, 405 U.S. 150 (1972), as well as the Jencks Act.  The Government

represents that it will provide this material as directed in the District Court's trial order.

This Court believes that fundamental fairness and the constitutional due process requirements which underlie *Brady* mandate that the Court have some discretion with respect to the timing of the disclosure of such information, even if it may be considered combined *Brady*/Jencks material.  Indeed, even with respect to purely Jencks Act materials, the Second Circuit has stated that "pre-trial disclosure will redound to the benefit of all parties, counsel and the court, ... sound trial management would seem to dictate that Jencks Act material should be submitted prior to trial ... so that those abhorrent lengthy pauses at trial to examine documents can be avoided." *U.S. v. Percevault*, 490 F.2d 126 (2d Cir. 1974); *U.S. v. Green*, 144 F.R.D. 631 (W.D.N.Y. 1992).

Here, the Court concludes that disclosure of such inculpatory and impeachment material, if any exists,  in accordance with the common practice in this district (prior to trial so long as it is disclosed in sufficient time for the defendants to have a fair opportunity to utilize the information at trial) is sufficient. The Court's conclusion includes Jorge's separate request for a search of Government personnel files for any *Brady* or *Giglio* material.

Jorge seeks a pretrial conspiracy hearing to test the foundation of co-conspirator statements pursuant to *Bourjaily v. U.S.*, 483 U.S. 171 (1987), *superseded by* Fed. R. Evid. 801(d)(2) (1997 Amendment).  The Court considers

this evidentiary issue best left to the trial judge. *See U.S. v. Glover*, 583 F. Supp. 2d 5, 10 n.8 (D.D.C. 2008). "Of course, should the Government fail to prove a conspiracy at trial, the conspiracy count would be removed from the jury's consideration pursuant to Fed. R. Crim. P. 29." *U.S. v. Wilk*, No. 04-cr-60216-JIC, Dkt. No. 339, at 2 (S.D. Fla. Mar. 14, 2005), *affirmed*, 2005 WL 7863458 (Apr. 29, 2005). The Court denies this request but without prejudice to renew as necessary at trial.

Jorge seeks an order directing the Government to preserve rough notes and other evidence taken by any law enforcement agents involved in the case. The Government opposes the request with respect to rough notes but has declared that it will give appropriate instructions to the agents regarding other evidence. In the event that issues arise at trial that require review of the items that Jorge has mentioned, the Government is directed to preserve rough notes and evidence taken, subject to further instructions from the trial judge.

Finally, Jorge seeks severance under Rule 14. This Court has a practice of deferring to the trial judge with respect to severance motions because of the potential impact on trial and calendar management. Accordingly, the Court denies the request but without prejudice to renew before Judge Skretny as may be appropriate.

### ii.    Suppression of Statements—Dispositive

Finally, Jorge has filed a declaration that the Court has construed as a

motion to suppress certain statements.  (Dkt. Nos. 110, 111.)  The Government
has announced that it will not seek to introduce at trial any of the statements in
question.  (Dkt. No. 114 at 2.)  The Court thus recommends denying Jorge's
motion as moot.

### C. Oscar Romero

#### i.   Omnibus Pretrial Motions—Non-dispositive

Defendant Oscar Romero ("Romero") filed corrected and supplemental
omnibus pretrial motions on October 23, 2014.  (Dkt. Nos. 204, 227.)  Romero
seeks permission to conduct voir dire of any government experts at trial, outside
the presence of the jury.  As the trial judge will be in a better position to assess
the need for any voir dire, the Court denies this request without prejudice to
renew at trial as needed.

Romero seeks an audibility hearing for any recordings that the
Government intends to introduce at trial.  Romero's request appears to be
prospective in nature; the Court does not recall the issue of audibility being
developed further in any subsequent proceedings.  The Court thus denies the
request but without prejudice to renew at trial as needed.

Romero seeks an order requiring disclosure of information pertaining to
informants who may have been involved in this case.  The Government is not
required to furnish the identities of informants unless it is essential to the
defense.  *Raver v. U.S.*, 353 U.S. 52, 60–61 (1957); *U.S. v. Saa*, 859 F.2d 1067,

1073 (2d Cir. 1988).  Nor does Rule 16 require the Government to disclose the names of witnesses prior to trial. *U.S. v. Bejaia*, 904 F.2d 137, 139 (2d. Cir. 1990).  Romero has not established that the pre-trial disclosure of the identities of any informants is essential to his defense.  The Court thus denies the request.

Romero has made other non-dispositive requests that duplicate the non-dispositive requests that Jorge made and that the Court addressed above.  The Court's rulings on Jorge's non-dispositive motions apply equally to Romero.

### ii. *Bruton Motion—Dispositive*

Romero has included a prospective motion to preclude from evidence any post-arrest statements by non-testifying co-defendants that might implicate him. Romero cites *Bruton v. U.S.*, 391 U.S. 123 (1968), as the basis for his request, though he acknowledged as of the time of the motion that he had not received any statements that actually implicate this issue.  Since the Court does not recall any *Bruton* issues being developed further in any subsequent proceedings, and since the trial judge would be in a better position to address those issues anyway, the Court recommends denying the request without prejudice to renew at trial as needed.

### iii. *Suppression of Wiretap Evidence—Dispositive*

Finally, Romero has made a motion to suppress information obtained by wiretap for approximately 60 telephone calls made from the targeted number that agents associated with Romero.  Analytically, Romero's motion is substantially

similar to the suppression motion filed by co-defendant Jose Rivera.  For the

sake of brevity, the analysis that the Court explains below for Jose Rivera's

suppression motion applies equally here.  For those reasons, the Court

recommends denying Romero's motion.

### D. Ellis Colon

#### i.    Omnibus Pretrial Motions—Non-dispositive

Defendant Ellis Colon ("Colon") has made omnibus pretrial motions (Dkt.

No. 88) that duplicate the non-dispositive omnibus motions that Jorge and

Romero made and that the Court addressed above.  For the sake of brevity, the

Court holds that its rulings for Jorge's and Romero's non-dispositive omnibus

motions apply equally to Colon.

#### ii.    Suppression of Search at 219 Fenton Street—Dispositive

Next, Colon seeks to suppress statements and other evidence obtained

from him at 219 Fenton Street ("Fenton") just after midnight on February 27,

2013.  (*See* Dkt. No. 99.)  As part of an ongoing investigation that started around

the summer of 2012, agents believed that Colon was a member of the Loiza

Boys and that his role in the gang was to store firearms.  Agents had some

inkling that Colon resided at Fenton but did not know who lived there with any

certainty.  (*See* Dkt. No. 244 at 26–27 ("Essentially we didn't know who was in

the residence."); *see also id.* at 48 ("Q. So, when you went up to the house, you

didn't know who lived in the house?  A. Correct.").)  Agents conducted no

surveillance of Fenton and had not applied for a search warrant of Fenton up to that point.  Agents also had no arrest warrant for Colon.  "The investigation was ongoing at the time.  On the evening—on the evening that Mr. Colon was arrested, it was still an ongoing investigation . . . . We hadn't obtained arrest warrants for any targets of the investigation prior to that . . . . I didn't have articulable facts for a specific charge at that point." (*Id.* at 43–44.)  The agents nonetheless prepared for a preemptive protective sweep of Fenton because "our information from our several-month investigation is that Mr. Colon possessed firearms, transported firearms, and so we had a concern for safety that there would be other individuals in the house that would potentially have access to weapons." (*Id.* at 27.)

At about 12:40 AM on February 27, 2013, 13 agents surrounded Fenton and knocked on the front door and likely also the windows around the house. Colon was asleep with his then-girlfriend (now wife) and his then-infant son, but the agents' activity awoke him. (*See id.* at 49 ("Q. Did he appear from what you saw that you had awakened him?  A. Yes.  I believe he was in pajamas.  As I said earlier, either a t-shirt and tank top or shorts and boxers.").)  The agents confronted Colon with their guns drawn as soon as he opened the door.  The agents cannot rule out the possibility that they entered the house enough to clear the front door's threshold. (*See id.* at 84; *see also* Dkt. No. 245 at 7 ("Q. And after your husband opened the door, what happened next?  A. I see a group of

21

agents coming in.  The first one kind of backed my husband like for him to get

back, and I was still getting dressed, but I was still seeing what's going on.  Q.

And how many agents came in?  A. I want to say roughly about between 10 and

13, agents." ).)  The agents immediately asked, "'[A]re you Ellis Colon.'  He said,

'yes.'  They said, 'where are the guns.  Where are the drugs.'  He said, 'there is

nothing here, there is nothing here.'"  (Dkt. No. 244 at 49.)  Colon then confirmed

that his girlfriend and son were in the house.  The parties disagree as to what

happened next.  According to the agents, "He [Colon] said something else and at

that point they [the agents] said we're going to—could we search, we need to

search the house and make sure no one is here and he said, 'okay.'"  (*Id.* at 50.)

Colon, through counsel, contends that the agents asked for permission to search

once they were already in with guns drawn, at which point he conceded the

reality of the situation and said, "Well, you're already in."  (*See id.* at 84.)  In any

event, the agents knew that a protective sweep was not necessary while Colon

was asleep.  (*See id.* at 52 ("Q.  And if he is asleep in his bed, there is no need

for a protective sweep, is there?  A. I suppose if he is asleep in his bed, there is

no need for a protective sweep.").

        "A 'protective sweep' is a quick and limited search of premises, *incident to

an arrest* and conducted to protect the safety of police officers or others."

*Maryland v. Buie*, 494 U.S. 325, 327 (1990) (emphasis added).  Common to the

cases assessing protective sweeps is an arrest that occurs first, which prompts

the need to enter a residence to check for anyone else who might be there.  *See,
e.g., U.S. v. Barone*, 721 F. Supp. 2d 261, 270 (S.D.N.Y. 2010) (explaining the
contours of a protective sweep "[w]hen a person is arrested inside the home").
Consent can obviate the need to justify a protective sweep, but the "government
has the burden of proving, by a preponderance of the evidence, that a consent to
search was voluntary.  Voluntariness is a question of fact determined by a totality
of all the circumstances.  The ultimate question presented is whether the officer
had a reasonable basis for believing that there had been consent to the search."
*U.S. v. Isiofia*, 370 F.3d 226, 230–31 (2d Cir. 2004) (internal quotation and
editorial marks and citations omitted).  "Consent must be a product of that
individual's free and unconstrained choice, rather than a mere acquiescence in a
show of authority."  *U.S. v. Wilson*, 11 F.3d 346, 351 (2d Cir. 1993) (citations
omitted).

Here, the Government has not met its burden of proving a voluntary
consent to enter Fenton.  Although an investigation was ongoing, the agents
have conceded that, as of February 27, 2013, they had no probable cause to
search Fenton and no probable cause to arrest Colon.  During the overnight of
February 26–27, 2013, nothing happened that implicated the premises at Fenton
or anyone inside.  The agents did not even know who was inside Fenton.  The
people who happened to be inside that night were asleep before the agents
showed up.  The agents thus had no reason to enter Fenton, for a protective

sweep or otherwise. Nonetheless, and even though Colon was asleep, 13 agents woke him up and immediately confronted him with guns drawn. *Cf. Wilson*, 11 F.3d at 351 (finding harmless error at trial but noting that "Oscar's limited education and knowledge of the English language, coupled with the fact that he was not informed of his right to refuse consent to the search, cause us to doubt whether Oscar actually consented to this search, particularly in light of the intrusive nature of the agents' entry into the apartment."). The Court finds entirely plausible that a large number of agents would have entered the threshold of Fenton to position themselves to see or to communicate with Colon better. At least as of the threshold entry, the agents did not explain to Colon what would happen to him if he did not allow a protective sweep. *Cf. U.S. v. Zadiriyev*, No. 08 CR 1327 (HB), 2009 WL 1033365, at *6 (S.D.N.Y. Apr. 17, 2009) (finding valid consent in part because "once the alternatives were clearly explained to him—that he could either provide consent or the agents would apply for a warrant—Zadiriyev reiterated his consent but maintained his position that he would not sign any documents."). Colon's alleged comment that "you are already in" is credible because it is consistent with an acquiescence to authority that all of the other circumstances set up.

Under these circumstances, Colon did not give valid consent, and the agents had no other reason to enter Fenton. Without a reason to enter Fenton,

the evidence that the agents subsequently obtained must be suppressed.  The
Court accordingly recommends granting Colon's motion.

### E. Edwin Sanchez

Defendant Edwin Sanchez ("Edwin") has filed omnibus pretrial motions
(Dkt. No. 98) that duplicate the non-dispositive, omnibus motions that Jorge and
Romero made and that the Court addressed above.  For the sake of brevity, the
Court holds that its rulings for Jorge's and Romero's non-dispositive omnibus
motions apply equally to Edwin.

### F. Jose Rivera

#### i. Omnibus Pretrial Motions—Non-dispositive

Defendant Jose Rivera ("Rivera") has filed omnibus pretrial motions (Dkt.
No. 91) that duplicate the non-dispositive, omnibus motions that Jorge and
Romero made and that the Court addressed above.  For the sake of brevity, the
Court holds that its rulings for Jorge's and Romero's non-dispositive omnibus
motions apply equally to Rivera.

#### ii. Suppression of Wiretap Evidence—Dispositive

Rivera has made a motion (part of Dkt. No. 91) to suppress any evidence
against him obtained by wiretap.  Rivera contends that physical surveillance,
controlled purchases, and conventional recorded conversations yielded abundant
evidence regarding drug transactions and other gang operations.  According to
Rivera, wiretap evidence was not necessary so long as the Government could

obtain evidence against defendants by conventional means.  Rivera also seeks

review of whether the Government did enough in the way of minimization.  Rivera

supplemented his motion with an affidavit (Dkt. No. 290) discussing the pole

camera video footage that the Government disclosed to counsel.  Rivera believes

that the video footage offers further proof of the effectiveness of conventional

investigative techniques.  Rivera believes further that the quantity of

conventionally obtained evidence raises enough questions about what the

Government presented in its wiretap applications that any wiretap evidence

should be suppressed for the additional reasons set forth in *Franks v. Delaware*,

438 U.S. 154 (1978). (Dkt. No. 290.)  The Government opposes the motion in all

respects.  The Government emphasizes the presumption of validity that attaches

to a wiretap authorization.  The Government presented wiretap applications

indicating probable cause that defendants were using telephones to distribute

drugs.  The Government argues it presented proper information when applying

for the wiretaps and that Rivera's concern about the exact amount of information

presented misses the point of a wiretap application.  According to the

Government, wiretaps do not have to be a tool of last resort; they need only be a

supplement to other investigative techniques that have limits when trying to

obtain certain types of information.

　　　A court may authorize a wiretap "if the judge determines on the basis of

the facts submitted by the applicant that (a) there is probable cause for belief that

an individual is committing, has committed, or is about to commit a particular offense enumerated in section 2516 of this chapter; (b) there is probable cause for belief that particular communications concerning that offense will be obtained through such interception; (c) normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous; [and] (d) except as provided in subsection (11), there is probable cause for belief that the facilities from which, or the place where, the wire, oral, or electronic communications are to be intercepted are being used, or are about to be used, in connection with the commission of such offense, or are leased to, listed in the name of, or commonly used by such person."  18 U.S.C. § 2518(3). Among other requirements, a wiretap application must include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  *Id.* § 2518(1)(c).  "[A] reviewing court will defer to the issuing court's determination that there was probable cause as long as there existed a substantial basis for a magistrate or judge to conclude that a search would uncover evidence of wrong-doing."  *U.S. v. Biaggi*, 853 F.2d 89, 95 (2d Cir. 1988) (internal quotation marks and citations omitted).  With respect to necessity, "the purpose of the statutory requirements is not to preclude resort to electronic surveillance until after all other possible means of investigation have been exhausted by investigative agents; rather, they only require that the agents

inform the authorizing judicial officer of the nature and progress of the investigation and of the difficulties inherent in the use of normal law enforcement methods." *U.S. v. Vazquez*, 605 F.2d 1269, 1282 (2d Cir. 1979) (internal quotation marks and citations omitted).  The wiretap statute also contains a requirement for "minimization."  "Every order and extension thereof shall contain a provision that the authorization to intercept shall be executed as soon as practicable, shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception under this chapter, and must terminate upon attainment of the authorized objective, or in any event in thirty days.  In the event the intercepted communication is in a code or foreign language, and an expert in that foreign language or code is not reasonably available during the interception period, minimization may be accomplished as soon as practicable after such interception."  18 U.S.C.§ 2518(5); *see also U.S. v. Terry*, 702 F.2d 299, 312 (2d Cir. 1983) (describing minimization as a requirement "that agents observe reasonable safeguards against excessive intrusion") (citations omitted).

Here, Rivera has not made enough of a showing to challenge the wiretap applications and to suppress the resulting wiretap evidence.  In the wiretap application, the Government explained the information that it had obtained up to that point about defendants and their interactions with each other.  The Government explained information that it obtained from confidential informants

about drug transactions; contrary to Rivera's argument, the number of informants involved and the number of controlled purchases associated with them does not, by itself, invalidate the argument for an application. *See, e.g., U.S. v. Pappas*, 298 F. Supp. 2d 250, 262 (D. Conn. 2004) (upholding a wiretap regardless of information obtained from cooperating witnesses and confidential informants); *U.S. v. Gigante*, 979 F. Supp. 959, 964 (S.D.N.Y. 1997) (upholding a wiretap where "the confidential sources were only privy to discrete aspects of the large racketeering pattern alleged"). The Government disclosed the extent to which pen register, trap and trace, and cellular site information revealed numerous communications consistent with the conventional information and likely to reveal details of arrangements for drug transactions. The Government also discussed the limits of the conventional techniques used. Specifically, the Government explained how the telecommunications information obtained to that point would not reveal the full extent of defendants' narcotics network. The Government explained further that the controlled purchases involving the confidential informants also would not reveal the full scope of defendants' operation, and that an undercover operation likely would not work given the familial relationship among defendants. Contrary to Rivera's arguments, the Government did disclose the use of a pole camera. (Dkt. No. 91-2 at 71, 92–93.) Finally, Rivera has not articulated a sufficiently specific concern about minimization. In all, the Court is satisfied that no *Franks* issues exist here and that the Government

fulfilled the statutory requirements for the wiretap.  The Court thus recommends denying Rivera's motion to suppress wiretap evidence.  This recommendation also applies to defendant Romero and any other defendant who joined the effort to suppress the evidence.

       *iii.*     *Suppression of Traffic Stop Evidence—Dispositive*

Rivera has made a motion (part of Dkt. No. 91) to suppress evidence obtained from a traffic stop.  On October 14, 2011, Buffalo Police stopped the vehicle at or near 370 Prospect Avenue.  Co-defendant Edwin was driving the vehicle; Rivera was a passenger.  Police pulled over the vehicle on suspicion of excessive window tinting.  Officers testified at the hearing that, upon approaching the vehicle and talking to the people inside, they detected a strong odor of marijuana.  The officers claim that the odor prompted them to direct Rivera and the others to exit the vehicle.  A subsequent pat-down revealed a loaded 9 mm handgun in Rivera's waistband.  Officers found no marijuana in the car or on any of its occupants; the parties disputed at the hearing whether anyone in the car made comments explaining why the car had a strong odor.  The felony information made reference to the odor of marijuana; the Vehicle and Traffic police report did not.  Rivera now wants the firearm evidence suppressed on the basis of an illegal traffic stop.  Rivera argues that the officers did not have a reason to pull over the car based on window tents and never quantified the actual tinting of the car's windows.  Rivera also emphasizes that officers found no

marijuana.  The Government asserts that the police did have reasonable

suspicion of a traffic infraction involving tinted windows, that the police did detect

an odor of marijuana, and that the driver of the vehicle, Edwin, explained that he

had smoked marijuana earlier and that the police could check the car to confirm

the absence of marijuana inside.

"[W]e now hold unambiguously that the reasonable suspicion of a traffic

violation provides a sufficient basis under the Fourth Amendment for law

enforcement officers to make a traffic stop . . . . [W]e note that a mistake of fact

does not undermine the existence of reasonable suspicion."  *U.S. v. Stewart*, 551

F.3d 187, 193 (2d Cir. 2009) (citations omitted).  Officers conducting a lawful

traffic stop may order a car's occupants out of the vehicle and may conduct a

limited pat-down for the sake of officer safety.  *See Pennsylvania v. Mimms*, 434

U.S. 106, 111 (1977); *see also Maryland v. Wilson*, 519 U.S. 408, 414–15 (1997)

("[D]anger to an officer from a traffic stop is likely to be greater when there are

passengers in addition to the driver in the stopped car.  While there is not the

same basis for ordering the passengers out of the car as there is for ordering the

driver out, the additional intrusion on the passenger is minimal.  We therefore

hold that an officer making a traffic stop may order passengers to get out of the

car pending completion of the stop."); *U.S. v. Gaines*, 457 F.3d 238, 243 (2d Cir.

2006) (citing *Wilson*).  Here, the officers involved testified that they observed

excessively dark windows on a car and initiated a traffic stop on that basis.

Rivera is correct when he points out that the Government does not seem to have quantified the actual tinting of the windows in question. Whether the quantitative tinting crossed the threshold for a violation, however, goes to whether the officers committed a mistake of fact and does not address whether the officers had reasonable suspicion. The Court finds the officer testimony credible with respect to reasonable suspicion, which by itself would have justified an order to have the car occupants exit and submit to a pat-down. The odor of marijuana, which does receive mention in the felony information, would have provided additional reasonable suspicion of ongoing criminal activity and would have provided an additional basis for the pat-down that yielded the firearm. The Court thus recommends denying Rivera's motion to suppress evidence from the traffic stop.

iv.     *Suppression of Search of 1517 Ashland—Dispositive*

Next, Rivera seeks suppression of evidence obtained from a search of his residence at 1517 Ashland Avenue in Niagara Falls, New York ("Ashland"). (*See* Dkt. Nos. 91, 144.) On or around April 5, 2013, the Clerk of the Court issued an arrest warrant for Rivera following his indictment. Meanwhile, law enforcement agents developed information indicating that Rivera resided at Ashland. Upon application from the Government, this Court issued a search warrant for Ashland. (*See generally* Case No. 13-MJ-2079.) Although officially titled a search warrant for a premises, the search warrant was limited to entering Ashland to seize

Rivera.  In fact, the executed warrant shows no inventory and notes only that
Rivera was arrested.  (*Id.* at Dkt. No. 2.)

Agents executed the search warrant for Ashland on the morning of April
10, 2013.  Agents entered Ashland around 6:15 AM that morning; there is some
indication in the record that agents damaged the front door to enter, which would
be consistent with the authorization in the search warrant to enter without first
knocking and announcing a presence.  Rivera was in custody by about 6:30 AM.
While in the house, agents encountered a woman named Carmen Ortiz ("Ortiz").
Ortiz is Rivera's girlfriend and the mother of their two children.  There are some
discrepancies in the testimony, but agents appear to have encountered Ortiz
when she was upstairs in the house, asked her to come downstairs, and secured
her for a brief period of time as part of the overall securing of the house.  Agents
eventually had Ortiz sit on a couch in the living room.  Agents presented Ortiz
with a Consent to Search form and reviewed it with her.  Ortiz then signed the
form.  (Dkt. No. 115-3.)  Agents subsequently searched Ashland and found
suspected marijuana, a gun magazine, drug paraphernalia, and over $14,000 in
currency.  (Dkt. No. 115-4.)

Rivera wants evidence from the search of Ashland suppressed on the
basis of a lack of valid consent.  Rivera emphasizes that the agents burst through
the front door and placed both him and Ortiz in custody in a significant show of
force.  Rivera argues that Ortiz signed the Consent to Search form only after that

33

show of force and only to avoid trauma to her children, who were still sleeping upstairs during the execution of the warrant.  Rivera concludes that Ortiz's signature under these circumstances constitutes an acquiescence to authority rather than a valid consent.  The Government counters that the agents took the time to explain their request for consent.[2]  The Government highlights that the agents also took the time to review the Consent to Search form and that Ortiz was not restrained in any way during this conversation.  The Government concludes that Ortiz decided voluntarily to sign the form.

As the Court addressed with defendant Colon above, the Government bears the burden of proving, by a preponderance of the evidence, that the totality of the circumstances points to a voluntary consent.  The brief time that Ortiz spent in custody or detained changes her situation a little compared to Colon's. "The fact of custody does not alone preclude the giving of a voluntary consent, but it should require more careful scrutiny." *U.S. v. Wiener*, 534 F.2d 15, 17 (2d Cir. 1976) (citations omitted).  That said, "neither the coercion inherent in the fact of arrest, nor a representation that a warrant will be obtained if consent is withheld, suffices to establish coercion.  Nor does a finding of coercion follow from the fact that [someone] was handcuffed." *U.S. v. Kon Yu-Leung*, 910 F.2d

---

[2] Incidentally, one of the exhibits that entered into evidence on July 29, 2014 was Government Exhibit 8, an FBI 302 report containing facts regarding the entry into Ashland.  Rivera has made a motion (Dkt. No. 186) to strike the exhibit as hearsay that does not fall under Rule 803(8). Under Rule 104(a), the Court is not bound by rules of evidence at a suppression hearing.  The Court accordingly denies the motion to strike.

33, 41 (2d Cir. 1990) (citations omitted).  Here, Ortiz was at home at the time of the search.  The agents' entry into Ashland and Ortiz's temporary detention likely were very stressful but ended fairly quickly.  Agents in different rooms of the house were having conversations with Rivera and Ortiz when Ortiz reviewed the Consent to Search form.  Agents took the time to explain the form to Ortiz, including its provision stating that Ortiz had the right to refuse consent.  Ortiz has testified that agents threatened to take her children taken away if she did not sign the Consent to Search form.  The record contains no other reference to discussions about Ortiz's children.  Nonetheless, even if the Court credits Ortiz and accepts that some reference to the children occurred, the totality of the record suggests a different context.  The more likely context was that, if the agents needed to return with a search warrant for the premises, and if further law enforcement actions at Ashland prompted Ortiz's arrest, then arrangements would have to be made regarding temporary custody of minor children.  Presenting that information, or words to that effect, would not have changed the totality of the circumstances in a way that would have nullified Ortiz's consent.

Under the circumstances of the search at Ashland, the Court concludes that Ortiz's consent was valid, and that the evidence obtained thereafter was not obtained illegally.  The Court thus recommends denying Rivera's suppression motion.

35

### G. Angel Sanchez

Defendant Angel Sanchez ("Angel") did not file his own pretrial motions *per se* but requested permission to join in motions that other co-defendants filed. (Dkt. Nos. 93, 277.)  The Court grants the motions for joinder; its rulings for Jorge's and Romero's non-dispositive omnibus motions apply equally to Angel.

### H. Raul Ramirez Vargas

Defendant Raul Ramirez Vargas ("Vargas") has filed omnibus pretrial motions (Dkt. No. 95) that duplicate the non-dispositive, omnibus motions that Jorge and Romero made and that the Court addressed above.  For the sake of brevity, the Court holds that its rulings for Jorge's and Romero's non-dispositive omnibus motions apply equally to Vargas.

### I. Josbel Garcia

Defendant Josbel Garcia ("Garcia") did not file his own pretrial motions *per se* but requested permission to join in motions that other co-defendants filed. (Dkt. No. 90.)  The Court grants the motions for joinder in part; its rulings for Jorge's and Romero's non-dispositive omnibus motions apply equally to Garcia.

### J. Miguel Manso

Defendant Miguel Manso ("Manso") has filed omnibus pretrial motions (Dkt. No. 95) that duplicate the non-dispositive, omnibus motions that Jorge and Romero made and that the Court addressed above.  For the sake of brevity, the

Court holds that its rulings for Jorge's and Romero's non-dispositive omnibus motions apply equally to Manso.

## IV. CONCLUSION

For all of the pending pretrial motions, the Court has made its findings and recommendations as explained above for each defendant.

## V. OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); FRCP 59. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).


SO ORDERED.

__/s Hugh B. Scott_____ __
HONORABLE HUGH B. SCOTT
UNITED STATES MAGISTRATE JUDGE

DATED: November 2, 2015